**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00744-TJK** |
| **v.** | : | |
| | : | |
| **GABRIEL BURRESS,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence Gabriel Burress ("Burress") to fourteen days incarceration, 36 months' probation, 60 hours community service, and $500 restitution.

## I.     Introduction

The defendant, Gabriel Buress, age 23, a laborer for an irrigation company in Delta, Ohio, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Burress pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of fourteen days jail, with supervision to follow, is appropriate in this case because: (1) the defendant was among the initial crowd who breached the metal barriers that prevented access to the closed east-side of the U.S. Capitol building; (2) he had watched as other rioters engaged in a physical struggle with police to breach these barriers; (3) he showed his support for the breach and incursion towards

1

the U.S. Capitol building when he grabbed a metal barrier and moved it further back into the crowd away from U.S. Capitol Police; (4) he moved forward with the crowd and made his way to the East Rotunda Door of the U.S. Capitol building; (5) he knew he should not enter the U.S. Capitol building, passing broken glass and sounding alarms; (6) he remained in the U.S. Capitol building for fourteen minutes and joined the chants of rioters; and (7) he minimized his own culpability in his interview with agents.

The Court must also consider that the defendant's conduct on January 6th, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. The defendant's participation in the riot, and facts unique to his case, support this recommended sentence.

## II.       Factual and Procedural Background

### The January 6, 2021, Attack on the Capitol

To avoid exposition, the Government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 35 ¶¶  1-7 (Statement of Offense). As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Gabriel Burress' Role in the January 6, 2021, Attack on the Capitol

On January 6, 2021, Gabriel Burress traveled with his co-defendant Madison Pettit and two other acquaintances, Cole Temple and Jodi Wilson,[1] all from Ohio, and attended the rally that

---

[1]       Jodi Wilson and Cole temple are also charged with conduct relating to their entry into the U.S. Capitol building in case number 1:21-mj-00568-ZMF.  The case remains pending.

former President Donald Trump held in Washington, D.C.  *See* ECF 38 at ¶ 19.  The first video of the group captured them on the east side of the U.S. Capital building near the temporary metal barriers that prevented the general public from entering the U.S. Capitol's exterior plaza and the building itself.  The exterior plaza and the U.S. Capitol building were closed to the public because a joint session of Congress was convening to certify the Electoral College totals from the 2020 Presidential Election vote.  ECF 35 p. 2; ECF 38 ¶ 12-14.

Two open-source videos show the conduct of Burress, Pettit, Wilson and Temple at this barrier on the east side of the U.S. Capitol building.  The chronological first video immediately begins with rioters pushing against U.S. Capitol Police Officer barriers as members of the crowd encourage them. *See* Bui, Kevin.  "Patriots have just stormed into the Capital building."  Facebook, 6 January, 2021, https://www.facebook.com/kevin.bui. 754/videos/5065387093501774:



Burress and Pettit appear early in the video and are close enough to see the struggle in front of them:



*Id.* at 1:42. The video shows that rioters, at the front of the crowd, were shoving police as a man near Burress, Pettit, Wilson and Cole shouted over a bullhorn "that's our fucking building – storm it – storm it – storm it - storm it! . . . You're not going to steal our country from us!" *Id.* at 3:30–4:00.  Burress and Pettit were several rows back, but in this crowd:



*Id.* at 3:53.

Approximately 5:40 seconds into the video, Jodi Wilson, who drove Burress and Pettit to Washington D.C., approached the individual making this video, who stood further back from the police line, and demanded, "We need everybody!  We can't do this by ourselves! Get your asses down here and let's fucking do this!"



*Id.* at 5:40 – 6:00.

Moments later, rioters attempted to rip barriers away from U.S. Capitol Police who were trying to secure them and at least one barrier was lost to the crowd.  *Id.* at 6:30–7:10. The barrier was pulled back into the crowd near the location where Burress, Pettit and Wilson stood.  An unknown woman and man intervened and appeared to pull the metal barrier back towards police. *Id.* at 7:10 - 7:22.  Burress, Pettit and Wilson grabbed the barrier and prevented them from returning it:



*Id.* at 7:35. Indeed, Pettit got into a verbal argument with the woman as Burress and Wilson continued to hold the barrier:



*Id.* at 7:36 – 8:25. Ultimately, Burress and Pettit yanked the metal barrier away and passed it back into the crowd:






*Id.* at 8:20 – 8:33.

Following this confrontation, Burress and Pettit are observed together several times in the video. Although they never engaged police directly, this video shows that they observed and supported the struggle to enter the closed Capitol plaza:

 

*See eg.* at 11:04, 14:00–14:50 (panning past Burress and Pettit to the confrontation between police and rioters.)

A second video, that overlaps with the first, shows the crowd, including Burress and Pettit, surge past police and rush towards the U.S. Capitol. *See* "Battle of the Barriers and the Rush towards the Capital Steps," YouTube, uploaded by AircraftSparky, January 7, 2021, https://www.youtube.com/watch?v=185f3LPxUYU&t=1.



*Id.* at 2:25 – 2:40.  This video captured Pettit yelling and waiving others towards the U.S. Capitol

as she advanced past the location where the barriers were previously:



*Id.* at 2:33. Thus, Burress and Pettit were among the first group to enter the closed area on the east-side of the U.S. Capitol building.

After the crowd broke through the east-side barriers, U.S. Capitol Police retreated to the steps of the U.S. Capitol and created a police line.  After several minutes, rioters breached that police line as well and swarmed up the east side steps of the U.S. Capitol building.  *See* "Eastside Capital Building 1/6/21," YouTube, uploaded by RFIRN, January 10, 2021, https://youtu.be/ZjLvYqJ2-EM?t=701 at 11:41- 28:35 (showing the U.S. Capitol Police retreat to the steps, the eventual breach of those steps, and the gathering near the East Rotunda Door).



Eastside Capital Building 1/6/21

Rioters filled up the steps and the area surrounding the East Rotunda Door and began chants including: "1776," "Stop the Steal," "Our House," and shouted obscenities at officers.  *Id.* at 33:00–38:00.  Some rioters are observed to assault officers who are guarding the doors as tear gas is dispersed in front of the door and rioters.  *Id.* at 37:00-38:00.  It is not known what the defendants saw during this time period.

11

Eventually, the East Rotunda Door was breached by rioters and rounds of U.S. Capitol incursions began.  *Id.* at 38:00–59:00; *See also United States v. Michael Rusyn,* 1:21-cr-00303-ABJ, ECF 49 pp. 3-4 (describing the earliest breach of the East Rotund Doors).  Although Pettit and Burress were among the first to pass the barriers around the U.S. Capitol and exterior plaza, they were not early entrants through the East Rotunda Doors.  Indeed, the doors had been breached more than 30 minutes earlier.  *Id.*  A video, that has been compared to U.S. Capitol security video, captured Pettit and Buress at the time they entered the East Rotunda Door to the United States Capitol building just after 3:02 pm:



*See* "US Capitol Under Siege to #STOPTHESTEAL," YouTube, uploaded by FNTV – FreedomNewsTV, January 7, 2021, https://youtu.be/WmV_7W4em5A?t=111 at 1:50 – 2:02.  The video shows that Burress and Pettit walked past broken door windows and sounding alarms.  *Id.*  Security camera footage also captured Burress' and Pettit's entry into the U.S. Capitol building and they have been traced through the Capitol:



Security footage shows that Burress and Pettit wandered in the entry area for less than one minute and then entered the U.S. Capitol Rotunda.  A video captured Burress and Pettit after they entered the Rotunda and shows the loud and chaotic nature of rioters:



"US Capitol Under Siege to #STOPTHESTEAL," YouTube, uploaded by FNTV – FreedomNewsTV, January 7, 2021, https://youtu.be/WmV_7W4em5A?t=122 at 2:02 – 2:15; ECF 33 ¶ 9 (admitting that the "crowd was loud with horns and chants by rioters.")  While inside the Rotunda, Burress and Pettit walked around together for minutes.  At approximately 3:06 pm, U.S. Capitol Police began forming a line to push rioters outside of the U.S. Capitol building.  Burress and Pettit were on the opposite side of the room away from police, shown where the green box is below:



 Burress and Pettit stay within the Rotunda until police advanced half-way through the Rotunda, then they began their exit just after 3:10 pm:



Security cameras capture Burress and Pettit holding up their hands as they waited in the crowd to exit the East Rotunda door:



A ground-level, open-source video, recorded the chaos as Burress and Pettit left the United States Capitol building and recorded Burress shouting "Our House" before he went out the door:



East Main "Columbus" Doors 1:45 - 4:45 pm - 56 video sync - Jan 6th Capitol Attack Footage

ECF 38 ¶ 22 (admitting the chant); "East Main 'Columbus' Doors 1:45 – 4:45 pm – 56 video sync – Jan 6th Capitol Attack Footage," YouTube, uploaded by Hunting Insurrectionists, March 12, 2021, *https://youtu.be/z1gODZvbhqs?t=5140* at 1:25:47 - 1:28:52.  Security cameras show that Burress and Pettit left the U.S. Capitol building just before 3:17 pm, having spent a little over 14 minutes inside the U.S. Capitol building.  Later, Pettit is briefly glimpsed in the crowd at the top of the U.S. Capitol steps, outside the East Rotunda door, looking out over the people below her:



"A Very Exciting Hour," YouTube, uploaded by Dan Rumble, January 13, 2021, https://www.youtube.com/watch?v=tnLLmjdAcUI&t=2820s at 26:59.

*Interviews of Burress and Pettit*

Burress was interviewed by agents on August 12, 2021. Burress was cooperative, even retrieving the hat that he wore on January 6, 2021, for agents. Burress identified himself, Pettit, Wilson and Temple, from U.S. Capitol Security video images. Burress told agents that Wilson drove all of them to Washington D.C. in Wilson's vehicle to "peaceful[ly]" join a march and denied having any knowledge of potential violence. He said that they followed the crowd to the U.S. Capitol building and entered, estimating that they were inside for ten minutes.

However, Burress minimized what he saw and did on January 6, 2021, and suggested that he was not responsible for his entry into the U.S. Capitol. After acknowledging that he was in a crowd that charged the U.S. Capitol building, Burress said he followed the crowd to the steps of the U.S. Capitol and was "sucked-up" and "pulled through the doors," pressed by the crowd behind him.

17

In direct questions from an interviewing agent, Burress denied: 1) participating in any violence, 2) destroying property, 3) "destroy[ing] any barricades or anything like that going up to the Capitol," and denied 4) engaging U.S. Capitol police officers.  Burress explained that he saw someone in the crowd take a riot shield from an officer, however he did not mention witnessing the struggle between U.S. Capitol Police and rioters at the exterior plaza barrier, nor his involvement in pulling one of the barriers further back into the crowd.  In the end, however, Burress expressed some remorse for attending, telling agents that it "ended up not being what we came for."

Madison Pettit was also interviewed on August 12, 2021.  Pettit told agents that she went to Washington D.C. to attend a "March for Trump" rally.  She said the U.S. Capitol area was extremely crowded and indicated that they joined a crowd who were headed in the direction of the U.S. Capitol building.  Pettit accurately stated that they stopped, and from "4-5 rows" back, they observed a gate (contextually the metal barriers just outside the exterior plaza).  Pettit stated that they stood there for "30-40 minutes" and observed a "dispute, or whatever, between people and officers."  Pettit stated that she heard people say "they're fighting, they're fighting" and she saw "a gate go flying and one come back" and saw officers swarm.  Pettit saw the crowd push past the officers towards the Capitol steps and she reported that they went forward with the crowd, and eventually up the steps.

Pettit said she could feel the pepper-spray in the air and in her lungs, and told agents that she understood that she should not be there: "at that point I was kinda like – uh, I'm not sure we should be doing – like here or whatever."  Pettit then explained that they remained on the steps and heard the crowd chant. Pettit reported hearing a loud bang and noticed that the door (presumably the East Rotunda Door) opened, and she could hear the "alarms" sounding.

Pettit explained that they initially walked to one side of the crowed area near the East Rotunda Door.  Later, they joined the crowd and went towards the U.S. Capitol door. Pettit indicated that when she got to the door, she had a conversation with an officer about whether she could enter the U.S. Capitol building.  She said an officer said something about "making the flow of traffic steady," suggesting that she was not told her entry was prohibited.  Security camera video, and the open-source video of her entry (cited above), does not show that this conversation occurred.  Indeed, security video shows that Pettit moved through the crowded door without speaking to officers and was speaking on her cell phone as she entered the U.S. Capitol building:



Pettit told agents that "so at one point we actually kinda got like pulled in" the U.S. Capitol.  She estimated that they were inside the U.S. Capitol building for ten minutes and waited in a line to exit.  She said they walked out of the U.S. Capitol, went down the steps, and believed she saw "tanks pulling up" and thought "this is our cue to like go home."  Pettit indicated that when they

got back to the car, they thought about going to Arlington National Cemetery, but saw that roads were blocked and decided to drive home. Pettit's text messages, discussed below, support her statement that they went to the car shortly after their exit from the U.S. Capitol building.

Towards the end of the interview, Pettit told officers that if another rally in Washington D.C. was organized, she probably wouldn't go because "it [the January 6, 2021, rally] was a lot more than we expected it to be." Pettit said their group did not coordinate with any other people or groups.

*Cell Phone and Social Media Evidence*

On August 12, 2021, Burress' and Pettit's iPhones were seized pursuant to search warrants. Messages recovered from Pettit's phone show that Pettit, Burress, Jodi Wilson, and Cole Temple coordinated their departure from Ohio to Washington D.C. on January 5, 2021, to attend the gathering. Text messages that Pettit sent to others on January 6, 2021, proved that she was at the U.S. Capitol building. In one message sent at 12:38 pm, Pettit makes reference to "stupid ass Capital police part of the swamp bad cops." At approximately 3:50 pm, over thirty-minutes after Pettit and Burress left the U.S. Capitol building, Pettit texted another and said, "We already stormed the building and went through it we are back in the car." Twenty-eight minutes later, at 4:18 pm, she sent a message to another saying, "We rushed the Capital." Pettit's phone also contained photos from January 6, 2021, showing the crowd inside and outside the U.S. Capitol building.

Burress gave agents his iPhone passcode at the time his phone was seized on August 12, 2021. He told law enforcement that he did not believe he had his phone with him when he joined the crowd on January 6, 2021, and stated that he did not have any photos from that day. Notably, Burress is not observed to be using his cell phone within the open-source and security videos cited

above, even though Pettit is observed to use her cell phone.  When agents searched Burress' seized iPhone, they found that the phone was either new or refreshed, because the phone's call records began on February 7, 2021.

Agents reviewed Madison Pettit's Facebook page and did not observe postings about the events of January 6, 2021.  In her interview, Pettit said that she posted to Facebook on January 6, 2021, but she deleted the post within an hour of leaving the U.S. Capitol building because she recognized that she should not be posting video of her presence at the riot.  Agents also discovered that Pettit's cell phone received a voicemail from "Jodi" on January 11, 2021, and Pettit was told to "get rid of your Facebook posts, I gotta talk to you."

Agents did not locate social media for Gabriel Burress from January 6, 2021.

### The Charges and Plea Agreement

Burress and Pettit were charged by complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G).  1:21-mj-00569-ZMF, ECF 1.  They were both arrested on August 18, 2021.  1:21-mj-00569-ZMF, ECF Nos. 7, 8. On December 2021, Burress and Pettit were jointly charged with violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building, by Information.  In their contemporaneous plea agreements, Burress and Pettit agreed to pay $500 in restitution to the Department of the Treasury. ECF Nos. 32, 34.

### III.   Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and U.S. Probation, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072,

1078-79 (D.C. Cir. 2008). Because this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a short period of incarceration and probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through barriers and barricades, as proven here, and heard the throes of a mob. Depending on the timing and location of their approach, they also may have

observed extensive fighting with law enforcement officials and smelled chemical irritants in the air – also proven here. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.

Burress and Pettit were in the crowd that first met the metal barriers on the east-side of the U.S. Capitol building.  Although the video does not show them engaging U.S. Capitol Police directly, they were present when other rioters did.  The two videos, cited above, show Burress and Pettit close to individuals who used bullhorns to incite the crowd's engagement of police and chastise members of the crowd who would not move forward as Pettit and Burress had already

done.  Pettit admittedly watched officers struggle to maintain the barriers and watched as rioters took barriers and passed them through the crowd.  Burress and Pettit went even further and helped by grabbing security barrier and pulling if further into the crowd. They won this struggle through arguing and yanking and contributed to the breach of the east-side.  Clearly, Burress and Pettit understood that U.S. Capitol Police were trying to keep the closed area secure and understood they could not go further and enter the U.S. Capitol building.

Pettit' and Burress' suggestion that they were somehow pushed into the U.S. Capitol building lacks credibility.  First, they watched the perimeter barriers being breached and listened as rioters advocated for the storming of the U.S. Capitol building.  Second, they passed signs of a forced-entry when they entered the U.S. Capitol building.  They smelled tear gas, walked past broken windows and into sounding alarms.  Accordingly, the nature and the circumstances of this offense establish the need for a sentence of incarceration and probation in this matter.

### B.  The History and Characteristics of the Defendant

Burress was young, 21 years old, at the time of his incursion into the U.S. Capitol building. ECF 38 p. 3. As set forth in the PSR, Burress' criminal history consists of one misdemeanor conviction for possessing less than 100 grams of marijuana and four minor traffic and parking infractions.  ECF 38 ¶¶ 30, 32.  He has been diagnosed with ADHD at a young age, graduated with a high school diploma, and works long hours, at times, as an irrigation serviceman, a job that he had before January 6, 2021.  ECF 38 ¶¶ 49, 53-54, 59, 62.  The defendant is close to his mother and step-father, who raised him.  ECF 38 ¶ 39.  His mother reports that her son and Madison Pettit, who have been in a long term relationship, have told her that they "are very regretful in taking the trip that day, not understanding how big it was."  ECF 39 ¶¶ 42, 48. This is all taken into consideration as we advocate for the fourteen-day sentence.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6th riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

In his interview, Burress gave indications of remorse about the events of January 6, 2021, telling agents that January 6, 2021, "ended up not being what we came for."  However, Burress

was not merely a bystander, or even a person whose culpability is restricted to joining a mob that could not be stopped.  Burress demonstrated that he supported the crowd's aggression and confrontation with U.S. Capitol Police when he stood close to the front of the crowd, listened to the calls for the breach of the barriers and then assisted by physically struggling to take a barrier from people who appear to be returning a barrier to police.

Also, Burress was not forthright when interviewed.  He downplayed what he saw and did at the plaza's exterior boundary, downplayed his observation of violence towards officers, and ultimately indicated that he was pushed into the U.S. Capitol building, even though video shows that he maneuvered past police to even get to the building.  Up to this point, Burress has not fully acknowledged what he did that day.  Thus, the need for specific deterrents also supports a period of incarceration and probation.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the Government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6th riot in mind. [3]  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A

---

[3] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

probationary sentence should not necessarily become the default.[4] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The defendant has pleaded guilty to an Information charging him with Parading, Demonstrating or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators.  In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's age.

However, the United States believes that the conduct of Pettit and Burress at the barriers clearly takes them out of the category of the least culpable misdemeanor defendants. They were in the mix in a very structurally important way – analogous to being involved or near a breach point at the Capitol itself.  The United States has generally recommended (and often received) jail time in cases where the defendant has been shown to be near or encouraged the engagement of law enforcement.  *See e.g. – United States v. Register*, 1:21;cr-00349-TJK (receiving 45 days incarceration where the defendant waved the crowd towards an access point, entered the U.S. Capitol past broken windows and over smashed glass, and ignored officers' clear attempts to clear

him and others from the building, and witnessed violence); *United States v. Gonzalez*, 1:21;cr-00115-CRC (receiving 45 days incarceration, 24 months probation, and a $1000 fine, where the defendant was among the first wave of rioters to enter the U.S. Capitol building, observed violence between rioters and officers, left the Capitol only when forced by law enforcement, and distributed marijuana within the U.S. Capitol building).

Buress and Pettit's conduct is significantly more aggravating than *United States v. Joshua and Jessica Bustle*, 1:21-cr-00238-TFH.  Like Burress and Pettit, the Bustles, who were in their mid to late 30's, entered the U.S. Capitol building through the East Rotunda Door, 30 minutes after it had been forced open.  Like Burress and Pettit, they walked past broken windows and sounding alarms.  The Bustles were likely within the Rotunda at the same time as Pettit and Burress because they had to leave the Rotunda because of the advancing police line that formed within the Rotunda. Like Burress and Pettit, the Bustles did not destroy property and agents did not find significant social media posts.

The conduct of Pettit and Burress is substantially more significant, however, because of their active support of the crowd that breached the east side barrier that ultimately resulted in the assault at a door of the U.S. Capitol building.  The Bustles were not shown to have moved barriers, like Pettit and Burress did.  Thus, the Court's sentence of one and two months home confinement for the Bustles, respectively, 40 hours of community service, and two years probation, is different than the punishment sought here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence).

### A.      This petty offense may include both incarceration and probation.

#### 1.      Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), codified at 18 U.S.C. § 3551 et seq.; *Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from

subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b). As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such

offense." H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  See H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

2.      **Analysis**

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense other

than a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment may affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant is sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (*per curiam*). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; see Cyclopedia of Federal Procedure, § 50:203, Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.")

(citing *Posley*); *see also Wright and Miller*, Federal Practice and Procedure, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense that is not petty.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same offense or a different offense that is not a petty offense," which would imply that the final modifier—i.e., "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (e.g., "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty

offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," see S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.  First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, supra, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that all of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, supra, at 327-329.  Where a

conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The 'specific provision'—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration

and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; see *United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1.  Relevant background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.  18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*

### 2.       Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104,  at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the Government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global

pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the Government recommends that this Court sentence Gabriel Burress to fourteen days incarceration and thirty-six months probation, 60 hours community service and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      */s/ Michael W. Mitchell*
MICHAEL W. MITCHELL
Assistant United States Attorney
Detailed to the District of Columbia
Texas Bar No.  24037126
555 4th Street, N.W.
Washington, D.C. 20530

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the forgoing motion was served upon counsel of record through ECF on the date of filing, this the 24th day of March, 2022.

By:       /s/ *Michael W. Mitchell*
          MICHAEL W. MITCHELL
          Assistant United States Attorney
          Detailed to the District of Columbia
          Texas Bar No.  24037126
          555 4th Street, N.W.
          Washington, D.C. 20530